UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

ST. PAUL FIRE & MARINE INSURANCE
COMPANY, a foreign corporation,

     Plaintiff,

v.

ROSEN MILLENNIUM INC., d/b/a/ ROSEN
MILLENNIUM TECHNOLOGY GROUP, a
Florida corporation, and ROSEN HOTELS &
RESORTS, INC., a Florida corporation,

     Defendants.

CASE NO. 6:17-CV-540-ORL-41-GJK

## ST. PAUL'S MOTION FOR FINAL SUMMARY JUDGMENT AND INCORPORATED MEMORANDUM OF LAW
### (Dispositive)

Plaintiff, ST. PAUL FIRE & MARINE INSURANCE COMPANY ("St. Paul"), by and through undersigned counsel, and pursuant to Fed. R. Civ. P. 56, Local Rule 3.01, and this Court's Case Management and Scheduling Order [D.E. 20], hereby files this Motion for Summary Judgment and Incorporated Memorandum of Law and in support thereof states as follows:

## I.    **INTRODUCTION**

At its core, this dispute involves a last-ditch attempt by one member of the Rosen corporate family, Rosen Hotels & Resorts (the "Hotel"), to recover its losses in connection with a hacking event by seeking proceeds from a liability policy issued to its wholly-owned subsidiary, Rosen Millennium Technology Group ("Millennium").[1] This attempt by the Hotel to recover its own first-party losses from a third-party liability insurance policy involved a scheme, discovered by St. Paul during the course of discovery, wherein the Hotel would send Millennium a false "demand letter"—devoid of both facts and the intention to follow through—to try to trigger St. Paul's policy. The Hotel's attempt to trigger coverage under Millennium's policy occurred only after no fewer than *three* other insurers denied coverage. The "demand letter" contains no facts concerning the nature of the alleged losses or of Millennium's alleged liability to its corporate parent for those losses, but instead merely recites verbatim the language contained in the coverage grant of the liability policy, without setting out any underlying facts other than the existence of a data breach. Indeed, this "demand letter" was drafted by Frank Santos—a director of both Millennium and the Hotel—in conjunction with Ashley Bacot[2]—the insurance agent for

---

[1] St. Paul insured only Millennium—not the Hotel—under the policies at issue in this suit.

[2] Mr. Bacot is the president of ProvInsure, the insurance agency for both Millennium and the Hotel. ProvInsure, while not a "true" subsidiary of the Hotel, is located inside the Rosen Plaza Hotel and is also owned in

both Millennium and the Hotel. It was sent to Tamara Flores, the Director of Information Technology at Millennium—but whose paycheck is issued by the Hotel. Quite simply, the "demand" was a letter from the Hotel to itself.

Even if the letter were accepted to be a "claim" for which Millennium would be entitled to coverage, the Hotel's attempt to trigger the liability policy issued to Millennium would still fail because there is no "personal injury" coverage under the policy issued to Millennium for a hack by third parties against the Hotel. It is undisputed that the computer systems hacked were not the insured's, and the party bringing the purported claim, the Hotel, is not a party who had its personal information stolen.

The issue of coverage for data breaches under general liability policies has been hotly contested over the past several years, during a time period in which many insurers—Travelers[3] included—have developed new products specifically tailored to respond to this new and increasingly common risk. In fact, both the Hotel and Millennium *purchased* this coverage from Beazley, through ProvInsure.[4] Beazley denied coverage for this loss under the cyber policy because the loss occurred prior to that policy's retroactive date. Had the Hotel and Millennium purchased Beazley's cyber coverage sooner, coverage would likely have applied and they would have been adequately protected.

---

part by Harris Rosen—a major shareholder in both Millennium and the Hotel. ProvInsure's employees' paychecks come from Rosen Hotels, and Frank Santos is one of ProvInsure's officers.

[3] As the Court is aware, St. Paul's ultimate parent is The Travelers Companies, Inc.

[4] As further proof of the parties' relatedness, both the Hotel and Millennium were named insureds on their shared cyber risk policy from Beazley.

Fowler White Burnett P.A. • One Financial Plaza, Suite 2100, 100 Southeast Third Avenue, Fort Lauderdale, FL 33394• (954) 377-8100

## II.   STATEMENT OF MATERIAL FACT

1.      Millennium is a wholly-owned subsidiary of the Hotel. Tamara Flores Dep. 21:11-13, Mar. 7, 2018. A copy of Ms. Flores' deposition has been filed at [D.E. 69].

2.      Both the Hotel and Millennium receive their insurance through the same agent— ProvInsure. *See* Ashley Bacot Dep. 63:19-21, Mar. 22, 2018. A copy of Mr. Bacot's deposition has been filed at [D.E. 67].

3.      ProvInsure is a related entity to the Hotel and Millennium. Harris Rosen owns both the Hotel and ProvInsure, Frank Santos is an officer of both the Hotel and ProvInsure, Ashley Bacot is both the president of ProvInsure and the risk manager for the Hotel, the paychecks of ProvInsure's employees are issued by the Hotel, and ProvInsure is located inside the Rosen Plaza Hotel. *Id.* at 8:19-9:14, 14:10-25, 15:25-16:3, 19:9-16, 20:23-21:6, 63:22-25.

4.      ProvInsure purchased a commercial general liability policy for Millennium from St. Paul, policy number ZPP-15N25399-14-I5, with effective dates of February 24, 2014 to February 25, 2015 (the "14-15 Policy"). A copy of that policy is already part of the record at [D.E. 32-1].

5.      The 14-15 Policy has limits of $1 million per event, $1 million for advertising injury per person, and $1 million for personal injury per person, all subject to a $2 million aggregate limit. [D.E. 32-1].

6.      The 14-15 Policy provides, in relevant part:

**What This Agreement Covers**

**Bodily injury and property damage liability**

We'll pay amounts any protected person is legally required to pay as damages for covered bodily injury or property damage that:

- happens while this agreement is in effect; and

- is caused by an event.

*Protected person* means any person or organization that qualifies as a protected person under the Who Is Protected Under This Agreement section.

*Bodily injury* means any physical harm, including sickness or disease, to the physical health of other persons.

******

*Property damage* means:

- physical damage to tangible property of others, including all resulting loss of use of that property; or

- loss of use of tangible property of others that isn't physically damaged

We'll consider all physical damage to tangible property of others that's a continuation, change, or resumption of previously known physical damage to tangible property of others to happen before this agreement begins if such continuation, change, or resumption would otherwise be covered by this agreement because of a continuous, multiple, or other coverage trigger required under the law that applies.

Of course, if there's a continuation, change, or resumption, after this agreement ends, of physical damage to tangible property of others that:

- isn't previously known physical damage to tangible property of others; and

- happens while this agreement is in effect;

we'll consider such continuation, change, or resumption to also happen while this agreement is in effect if that would be the result because of a continuous, multiple, or other coverage trigger required under the law that applies.

******

*Tangible property* does not include data.

******

*Event* means an accident, including continuous or repeated exposure to substantially the same general harmful conditions.

******

FOWLER WHITE BURNETT P.A. • ONE FINANCIAL PLAZA, SUITE 2100, 100 SOUTHEAST THIRD AVENUE, FORT LAUDERDALE, FL 33394• (954) 377-8100

**Personal injury liability.** We'll pay amounts any protected person is legally required to pay as damages for covered personal injury that:

- results from your business activities; and

- is caused by a personal injury offense committed while this agreement is in effect.

*Personal injury* means injury, other than bodily injury or advertising injury, that's caused by a personal injury offense.

*Personal injury offense* means any of the following offenses:

- False arrest, detention, or imprisonment.

- Malicious prosecution.

- Wrongful entry into, or wrongful eviction from, a room, dwelling, or premises that a person occupies, if such entry or eviction is committed by or for the landlord, lessor, or owner of that room, dwelling, or premises.

- Invasion of the right of private occupancy of a room, dwelling, or premises that a person occupies, if such entry or eviction is committed by or for the landlord, lessor, or owner of that room, dwelling, or premises.

- Libel, or slander, in or with covered material.

- Making known to any person or organization covered material that disparages the business, premises, products, services, work, or completed work of others.

- Making known to any person or organization covered material that violates a person's right of privacy.

*Covered material* means any material in any form of expression, including material made known in or with any electronic means of communications, such as the Internet.

******

**Right and duty to defend a protected person.**

We'll have the right and duty to defend any protected person against a claim or suit for injury or damage covered by this agreement. We'll have such right and duty even if all of the allegations of the claim or suit are groundless, false, or fraudulent. But we won't have a duty to perform any other act or service. We'll

- 6 -

have the right to investigate any event, offense, claim, or suit to the extent we believe is proper. We'll also have the right to settle any claim or suit within:

- any applicable deductible; or

- the available limits of coverage.

******

*Claim* means a demand that seeks damages.

******

## Exclusions – What This Agreement Won't Cover

******

Contract liability. We won't cover injury or damage for which the protected person has assumed liability under any contract or agreement.

******

7. St. Paul also issued a commercial general liability policy to Millennium with effective dates of February 24, 2015 through February 24, 2016, policy number ZPP-15N25399-15-15. A copy of that policy (the "15-16 Policy") is already a part of the record at [32-2].

8. The 15-16 Policy contains the same terms as the above-quoted language from the 14-15 Policy. As such, the 14-15 Policy and 15-16 Policy will be collectively referred to as the "Policies."

9. In early February of 2016, the Hotel began to receive reports pertaining to patterns of unauthorized charges on customer cards shortly after they were used by guests during their stay at the Hotel. *See* Frank Santos Dep. 20:7-11, Mar. 7, 2018. A copy of Mr. Santos' deposition has been filed at [D.E. 68].

10. Shortly thereafter, the Hotel allegedly retained forensic investigators, allegedly at a cost of approximately $163,000, to determine whether a breach had occurred, and if so, its

source. *See* Hotel's Answers to Plaintiff's First Set of Interrogatories no. 4 and 11, attached hereto as **Exhibit "A"**.

11.     The investigation revealed that malware had been installed on the payment network, and that cards used at the Hotel between September 2014 and February 2016 may have been affected. Flores Dep. 30:18-31:5.

12.     Indeed, there were allegedly three windows of the breach: September 2, 2014 to September 15, 2015; September 25, 2015 to February 10, 2016; and February 11, 2016 to February 18, 2016. Flores Dep. 38:5-25; *see also* Email from Sandra Kornegay to Chad Larson, attached hereto as **Exhibit "B"**.

13.     As a result, on or about March 4, 2016, in compliance with various state laws, the Hotel disclosed to the group of allegedly affected customers that a data breach may have occurred, and encouraged its affected customers to remain vigilant for signs of unauthorized charges. *See* Hotel Press Release, attached hereto as **Exhibit "C"**.

14.     As a result of the alleged attack and the findings of the investigation, and in accordance with their respective card services agreements, Visa, MasterCard, and American Express imposed substantial fines on the Hotel. *See* **Exhibit "A"**.

15.     MasterCard allegedly imposed a fine of $1,005,139.72 on the Hotel in connection with the breach. *Id.*

16.     American Express allegedly imposed a fine on the Hotel of $128,830.00 in connection with the breach. *Id.*

17.     Visa imposed a fine on the Hotel of approximately $850,000 in connection with the breach. Santos Dep. 44:25-45:18.

18.     In all, the Hotel allegedly incurred economic loss of approximately $2.2 million.

Fowler White Burnett P.A. • One Financial Plaza, Suite 2100, 100 Southeast Third Avenue, Fort Lauderdale, FL 33394• (954) 377-8100

19.     In addition to the Policies, both the Hotel and Millennium were named insureds on a Beazley Breach Response policy, policy number W178DE150101, with effective dates of January 12, 2015 through February 1, 2016 (the "Beazley Policy"). A copy of the Beazley Policy has been attached hereto as **Exhibit "D"**. Broadly speaking, the Beazley Policy provides coverage for data breaches, subject to its exclusions and limitations.

20.     The Beazley Policy was also procured by ProvInsure, and paid for by the Hotel. Jason Vega Dep. 23:20-24:4, Mar. 22, 2018. A copy of Mr. Vega's deposition has been filed at [D.E. 71].

21.     The Defendants did not purchase the Beazley Policy—or any cyber liability policy—until the 2015-2016 Beazley Policy, and only purchased that policy because they were required to obtain such coverage by certain convention groups. Vega Dep. 34:23-41:3.

22.     On or about February 5, 2016, Millennium reported the data breach to Beazley. *See* Email from Beazley acknowledging notice of claim, attached hereto as **Exhibit "E"**.

23.     On or about April 21, 2018, Beazley denied coverage under its policy on the grounds that the three breach windows were related or continuing acts. As such, the breach was deemed to have occurred prior to the retroactive date on the policy, thereby precluding coverage. *See* Beazley's denial letter, attached hereto as **Exhibit "F"**.

24.     Despite being aware of the availability of such coverage for years, the Hotel chose not to purchase cyber insurance until they were required to by certain convention groups. *See* Vega Dep. 33:15-41:9.

25.     The Hotel also submitted the claim to Federal Insurance Company, which issued a crime policy to the Hotel and Millennium. A copy of the crime policy is attached hereto as **Exhibit "G"**.

FOWLER WHITE BURNETT P.A. • ONE FINANCIAL PLAZA, SUITE 2100, 100 SOUTHEAST THIRD AVENUE, FORT LAUDERDALE, FL 33394• (954) 377-8100

26.     On or about June 8, 2016, Federal denied coverage on the grounds that no insuring clause applied to a hacking event. *See* Federal's denial letter, attached hereto as **Exhibit "H"**.

27.     The Hotel also submitted a claim to its *own* general liability carrier, Zurich. Zurich denied coverage on or about July 8, 2016. *See* Zurich's denial letter, attached hereto as **Exhibit "I"**.

28.     Lastly, the Hotel submitted a claim to Fireman's Fund, which issued an excess general liability policy to the Hotel and Millennium. Ashley Bacot Dep. 37:14-17, 39:8-14, Mar. 22, 2018. Fireman's Fund denied coverage as well. *Id.* at 39:16-18.

29.     Millennium did not put St. Paul on notice of the data breach until December 29, 2016, when ProvInsure submitted a notice of claim. *See* Notice of Claim to St. Paul, attached hereto as **Exhibit "J"**.

30.     ProvInsure submitted the claim after Ashley Bacot received an email from Frank Santos—who holds C-level positions at the Hotel, Millennium, and ProvInsure—stating:

> "The breach was due to Millennium's neglect in not securing Rosen Hotels' systems. Do they have insurance to cover such a loss? Between you and me for now, when I share the Master Card penalty with Mr. Rosen I plan to tell him Millennium should pay this fee. The problem with that is Millennium's annual profit is distributed to the Hotels. So the hotels do suffer in the end but the point needs to be made that this was a Millennium problem not the Hotel."

A copy of that letter is attached hereto as **Exhibit "K"**.

31.     Shortly after receiving that email, Mr. Bacot reached out to Mr. Vega and asked "if Millennium has coverage for cyber on their GL coverage." Mr. Vega responded that "[Millennium] is included on [the Hotel's] cyber policy and they do not have separate coverage

FOWLER WHITE BURNETT P.A. • ONE FINANCIAL PLAZA, SUITE 2100, 100 SOUTHEAST THIRD AVENUE, FORT LAUDERDALE, FL 33394 • (954) 377-8100

under their GL." *See* emails between Ashley Bacot and Jason Vega, attached hereto as **Exhibit "L"**.

32.    On December 28, 2016, the day before ProvInsure submitted the claim to St. Paul, Mr. Vega wrote to Mr. Bacot again, stating "Filing a claim on this policy might be worth considering given the size and cost of the breach, however, I have a strong feeling coverage won't apply." *See* additional emails between Jason Vega and Ashley Bacot, attached hereto as **Exhibit "M"**.

33.    The notification to St. Paul simply stated "Credit card systems breach. Loss dates range from Sept 2014 thru Feb 2016." It further instructed St. Paul to contact Millennium's insurance broker for additional information. *See* **Exhibit "J"**.

34.    Jason Vega, an employee of ProvInsure and (as a result) an agent of both Millennium and the Hotel, admitted that when he submitted the claim, he had a strong feeling that coverage did not apply, and that the submission of the claim was a "roll of the dice." Jason Vega Dep. 130:24-131:17; *see also* **Exhibit "M"**.

35.    In fact, at his deposition, Mr. Vega was unable to even articulate which coverage grant the loss fell under. Vega Dep. 86:12-93:12.

36.    After conferring with Sandra Kornegay (another employee of ProvInsure) regarding the notification, and after receiving no additional information, St. Paul provided a coverage denial to the insured on or about March 2, 2017, stating that there was no coverage for Millennium's claim. It further invited Millennium to provide additional information that might bear on St. Paul's coverage obligations under the 14-15 Policy. A copy of that letter is attached hereto as **Exhibit "N"**; *see also* Chad Larson Dep. 47:2-19, Mar. 8, 2018. A copy of Mr. Larson's deposition has been filed at [D.E. 70].

FOWLER WHITE BURNETT P.A. • ONE FINANCIAL PLAZA, SUITE 2100, 100 SOUTHEAST THIRD AVENUE, FORT LAUDERDALE, FL 33394• (954) 377-8100

37.     On June 8, 2017, after this lawsuit had been filed, counsel for Millennium and the Hotel sent a letter to the undersigned enclosing a purported demand letter (dated June 5, 2017) from the Hotel to Millennium, in which the Hotel claimed entitlement to payment from Millennium on account of the breach. A copy of that letter is attached hereto as **Exhibit "O"**.

38.     As of today, over two years after the data breach was discovered, no customers have made claims against either the Hotel or Millennium, and the Hotel has not filed a lawsuit against Millennium. Santos Dep. 47:9-11; Flores Dep. 82:9-13.

## III.   MEMORANDUM OF LAW

### A.     Standard for Summary Judgment

A court should grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The movant bears the burden of establishing the absence of a genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). As to materiality, the substantive law will identify which facts are material, and factual disputes that are irrelevant or unnecessary will not be counted. *Id.* at 248. The party opposing a motion for summary judgment must rely on more than conclusory statements or allegations unsupported by facts. *Evers v. Gen. Motors Corp.*, 770 F.2d 984, 986 (11th Cir. 1985).

### B.     Principles of Insurance Contract Interpretation

Florida law governs the interpretation of the policies at issue. *LaFarge Corp. v. Travelers Indem. Co.*, 118 F.3d 1511, 1515 (11th Cir. 1997). The core tenet of Florida insurance law is that

FOWLER WHITE BURNETT P.A. • ONE FINANCIAL PLAZA, SUITE 2100, 100 SOUTHEAST THIRD AVENUE, FORT LAUDERDALE, FL 33394• (954) 377-8100

every insurance policy is construed according to its plain language. *Auto-Owners Ins. Co. v. Anderson*, 756 So. 2d 29, 34 (Fla. 2000). Where the language of an insurance policy is plain and unambiguous, "there is no need for judicial construction and the contract must be enforced as written." *Fla. Power & Light Co. v. Penn Am. Ins. Co.*, 654 So. 2d 276, 278 (Fla. 4th DCA 1995) (citing *Great Global Assur. Co. v. Shoemaker*, 599 So. 2d 1036 (Fla. 4th DCA 1992)). The policy terms must be given the plain and ordinary meaning as understood by the "average man." *Berkshire Life Ins. Co. v. Adelberg*, 698 So. 2d 828, 830 (Fla. 1997).

If a policy provision is clear and unambiguous, the court cannot indulge in construction or interpretation of its plain meaning, and should simply enforce it according to its terms, whether it is a basic insuring clause or an exclusionary provision. *BMW of N. Am., Inc. v. Krathen*, 471 So. 2d 585, 587 (Fla. 4th DCA 1985); *see also Allstate Ins. Co. v. Shofner*, 573 So. 2d 47, 49 (Fla. 1st DCA 1990) (holding that ambiguities are to be construed in favor of coverage but only after ordinary rules of construction are applied). In other words, in the absence of ambiguity, courts are not permitted to rewrite contracts, add meaning that is not present, or otherwise reach results contrary to the manifest intention of the parties. *Shofner*, 573 So. 2d at 49. Policy language is ambiguous only if it is susceptible to more than one reasonable interpretation. *Anderson*, 756 So. 2d at 34. Importantly, a provision is not ambiguous simply because it is complex or requires analysis. *Garcia v. Fed. Ins. Co.*, 969 So. 2d 288, 291 (Fla. 2007). Only when a genuine inconsistency, uncertainty, or ambiguity in meaning remains after resort to the ordinary rules of construction is the policy construed in favor of the insured. *State Farm Fire & Cas. Co. v. CTC Dev. Corp.*, 720 So. 2d 1072, 1076 (Fla. 1998).

With that in mind, general liability insurance policies may impose two duties on the insurer, a duty to defend and a duty to indemnify. With respect to determining the duty to defend,

- 13 -

Florida follows the so-called "eight corners rule." *Mid-Continent Cas. Co. v. Royal Crane, LLC*, 169 So. 3d 174, 182 (Fla. 4th DCA 2015); *see also Composite Structures, Inc. v. Cont'l Ins. Co.*, 560 F. App'x 861, 864-65 (11th Cir. 2014) (applying Florida law). The "eight corners" refer to the four corners of the complaint and the four corners of the insurance policy. *See Acosta, Inc. v. Nat'l Union Fire Ins. Co.*, 39 So. 3d 565, 575 (Fla. 1st DCA 2010). Thus, when the complaint alleges facts that fairly and potentially bring the suit within policy coverage, the duty to defend exists. *Jones v. Fla. Ins. Guar. Ass'n, Inc.*, 908 So. 2d 435, 442-43 (Fla. 2005). However, where the insurer has no duty to defend, it necessarily has no duty to indemnify. *Fun Spree Vacations, Inc. v. Orion Ins. Co.*, 659 So. 2d 419, 421 (Fla. 3d DCA 1995).

Lastly, it should be noted that both the Hotel and Millennium had cyber insurance with Beazley, which denied coverage only because, in its opinion, the loss predated the retroactive date.[5] Florida historically prefers to construe policies so as not to overlap in coverage. *State Farm Mut. Auto Ins. Co. v. Spahn*, No. 8:12-cv-2619-T-23EAJ, 2013 WL 5532761, at *2-4 (M.D. Fla. Oct. 7, 2013); *Farrer v. U.S. Fid. & Guar. Co.*, 809 So. 2d 85, 94 (Fla. 4th DCA 2002) ("Generally, courts have been reluctant to find duplicate coverage under the two types of policies."). Thus, to the extent coverage was available under the Beazley policy (but for the retroactive date, which affects the time frame of coverage, but not its subject matter), it would conflict with Florida policy to find coverage under St. Paul's general liability policy.

**C.     There Is No "Claim" Against Millennium That Would Trigger St. Paul's Duty to Defend.**

The "claim" is nothing more than a scheme to manufacture coverage by having a corporate parent issue a demand to its wholly-owned subsidiary. The substantive portion of the

---

[5] St. Paul takes no position as to whether Beazley's denial was ultimately proper.

"demand letter," written by Frank Santos on the Hotel's letterhead and sent to Tamara Flores of Millennium, reads in its entirety:

> As you are aware, [the Hotel] became aware of a data breach in March of 2016, in which [Millennium] made private information known to third parties that violated a credit card holder's right of privacy. [The Hotel] has incurred damages thus far in the amount of $1,402,970 and anticipates significant additional damages. [The Hotel] hereby demands [Millennium] to immediately pay [the Hotel] damages relating to the data breach in the amount of $1,402,970 plus any additional damages which will be incurred.

> Please put your insurance company on notice regarding this claim immediately.

See Exhibit "O".

Frank Santos is the vice president, secretary, treasurer, and chief financial offer of the Hotel. Santos Dep. 7:19-22. Frank Santos is also the vice president, secretary, treasurer, and chief financial offer of Millennium. *Id.* at 21:11-16. He is also the secretary and treasurer of ProvInsure. Bacot Dep. 20:23-21:8. On the other side, Tamara Flores is the Director of Information Technology for Millennium, but is paid by the Hotel. Flores Dep. 8:5-18. The Hotel and Millennium file a joint tax return, and losses suffered by one are suffered by the other. Santos Dep. 38:19-39:17; *see also* Exhibit "K" ("The problem with that is Millennium's annual profit is distributed to the Hotels. So the hotels do suffer in the end but the point needs to be made that this was a Millennium problem not the Hotel."). And, of course, Jason Vega admitted *the day before* the claim was submitted that "I have a strong feeling coverage won't apply." *See* Exhibit "M".

This highly unusual circumstance calls into doubt whether the letter constitutes a "claim" made in good faith. *See Cox v. CSX Intermodal, Inc.*, 732 So. 2d 1092, 1097 (Fla. 1st DCA 1999) (noting the implied covenant of good faith and fair dealing, wherein each party "promises to perform their part of the bargain in good faith, and expects the other party to do the same."). The

FOWLER WHITE BURNETT P.A. • ONE FINANCIAL PLAZA, SUITE 2100, 100 SOUTHEAST THIRD AVENUE, FORT LAUDERDALE, FL 33394• (954) 377-8100

highly unusual nature of this "demand" is demonstrated by the difficulty in envisioning what a defense counsel would do if St. Paul were to appoint one to defend Millennium against the Hotel. Could counsel have privileged conversations with the officers of Millennium about the strengths and weaknesses of the "claim" that would be shielded from the officers of the Hotel? This difficulty is further compounded by the fact that in *this* case, both the Hotel and Millennium[6] are represented by the same counsel, a curious decision if the two parties are truly adverse to one another. St. Paul respectfully submits that they are not adverse. Despite the "demand" being issued nearly a year ago, and despite the breach being made public over two years ago, there is no lawsuit between the Hotel and Millennium. Santos Dep. 63:22-24. In fact, there has *never* been a lawsuit between the Hotel and Millennium on *any* subject. Bacot Dep. 165:6-18; Vega Dep. 159:7-160:4.

As a further demonstration of the collusive nature of the June 5 letter, the "demand" merely parrots—almost verbatim—the language in the coverage provision for personal injury. That provision covers "amounts any protected person is legally required to pay as damages for coverage personal injury that…is caused by a personal injury offense." "Personal injury offense" is then further defined as, *inter alia*, "making known to any person or organization covered material that violates a person's right of privacy." This is almost identical to the language used in the "claim", which alleges that "[Millennium] made private information known to third parties that violated a credit card holder's right of privacy." *See State Farm Fire & Cas. Co. v. Steinberg*, 393 F.3d 1226, 1230 (11th Cir. 2004) ("Conclusory 'buzz words' unsupported by

---

[6] ProvInsure, too, is represented by the same lawyers that represent the Hotel and Millennium in this case. *See* Bacot Dep. 5:23-25.

FOWLER WHITE BURNETT P.A. • ONE FINANCIAL PLAZA, SUITE 2100, 100 SOUTHEAST THIRD AVENUE, FORT LAUDERDALE, FL 33394• (954) 377-8100

factual allegations are not sufficient to trigger coverage."); *Amerisure Ins. Co. v. Gold Coast Marine Distribs., Inc.*, 771 So. 2d 579, 581-82 (Fla. 4th DCA 2000) (same).

Most importantly, however, the "claim" does not allege any action on behalf of Millennium, either negligently or intentionally, that would render it liable to the Hotel. The first allegation is that Millennium "made known" private information. The second allegation is that the *Hotel* incurred damages.[7] The second statement is a non-sequitur. There is no allegation that would support any theory of recovery by the Hotel against Millennium. Nothing in the "demand" itself alleges any relationship between the Hotel and Millennium, and there is no indemnity agreement between the two companies. Flores Dep. 27:20-28:2.

### D.    Assuming *Arguendo* That There Is a Claim, It Is Not One for Covered Damages.

#### 1.    Because the Hotel Did Not Have a Privacy Right Violated, It Has No Claim Against Millennium.

The relevant definition of a personal injury offense—the existence of which is the *sine qua non* for personal injury coverage—is "Making known to any person or organization covered material[8] that violates a person's right of privacy." The Hotel is ostensibly making a claim against Millennium for the loss of customer data. The Hotel has no privacy interest of its own in its customers' data. Indeed, corporations do not have a "personal privacy" interest at all. *FCC v. AT&T, Inc.*, 562 U.S. 397, 406 (2011) (noting that the specific concept of personal privacy did not apply to corporations as a matter of common law); *see also Alterra Healthcare Corp. v. Estate of Shelley*, 827 So. 2d 936, 941 (Fla. 2002) (noting that the right to privacy inures only to

---

[7] Those damages are the same damages that were set forth in the January 11, 2017 email from Sandra Kornegay to St. Paul, which are limited to forensic specialists, attorney's fees for complying with data breach laws, the hiring of a crisis management firm, notification costs, and assessments from credit card companies. Santos Dep. 48:14-49:21; Exhibits "A", "B".

[8] St. Paul does not contest that the information leaked in the hack qualifies as "covered material."

FOWLER WHITE BURNETT P.A. • ONE FINANCIAL PLAZA, SUITE 2100, 100 SOUTHEAST THIRD AVENUE, FORT LAUDERDALE, FL 33394• (954) 377-8100

natural persons and that under normal circumstances, a litigant must assert his or her own legal rights and interests, not those of third parties). Florida courts have at least tacitly concluded that corporations do not have a privacy right in their customers' data sufficient to make a claim for personal injury on account of its dissemination. *Cf. Creative Hospitality Ventures, Inc. v. U.S. Liab. Ins. Co.*, 655 F. Supp. 2d 1316, 1334 (S.D. Fla. 2009) ("By enacting a law designed to protect the privacy of card holders' complete payment card account numbers, Congress, at the very least, recognized a ***card holder's right of privacy*** in the card holder's complete card account number and account information, and a corresponding right of privacy not to have that information exposed on an electronically printed payment card receipt.") (emphasis added), *rev'd on other grounds*, 444 F. App'x 370 (11th Cir. 2011).

In short, the alleged "claim" made by the Hotel does not set forth a privacy right *of its own* that has been violated. Instead, it refers to violation of a "credit card holder's right of privacy." The Hotel does not have standing to make a claim on behalf of a credit card holder. *See P.F. Chang's China Bistro, Inc. v. Fed. Ins. Co.*, No. CV-15-01322-PHX-SMM, 2016 WL 3055111, at *5 (D. Ariz. May 31, 2016) (holding that card issuers could not make claim for privacy damages and that such claim could only be made by a cardholder). The policy, like all general liability policies, is designed to provide coverage to the insured for actions that it took when those actions cause harm to a particular plaintiff. It is not designed, nor is it intended, to protect against claims by companies which—by their own admission—have not had a right violated. *See City of Delray Beach v. Agric. Ins. Co.*, 936 F. Supp. 931, 939 (S.D. Fla. 1994) (holding that there was no personal injury coverage available to the insured City of Delray Beach in connection with environmental contamination because personal injury offenses "relate to the violation of private rights," there was no charge against the insured by a private occupant of the

FOWLER WHITE BURNETT P.A. • ONE FINANCIAL PLAZA, SUITE 2100, 100 SOUTHEAST THIRD AVENUE, FORT LAUDERDALE, FL 33394• (954) 377-8100

city's water supply, and accordingly there could be no "invasion of the right of private occupancy").

### 2. Because Millennium Did Not Publish The Data In Question, The "Making Known" Requirement Has Not Been Met.

The relevant definition of personal injury also requires that the insured "mak[e] known" the covered material. The term "making known" is, at broadest, synonymous with the more common "publication." *See State Farm Gen. Ins. Co. v. JT's Frames, Inc.*, 104 Cal. Rptr. 3d 573, 587 (Cal. Ct. App. 2010) ("The distinction lies chiefly in the use of the word 'publication' rather than the phrase 'making known to any person or organization.' We find it to be one without a difference."). Where courts find the terms to differ, "making known" is construed to be *more* specific than "publication", thereby making coverage more difficult to establish. *Owners Ins. Co. v. European Auto Works, Inc.*, 695 F.3d 814, 821 (8th Cir. 2012) (applying Minnesota law) ("We agree…that 'publication' is more general than 'making known.'"). The Florida Supreme Court has previously defined "publication" as "communication (as of news or information) to the public: public announcement" or as "the act or process of issuing copies (as a book, photograph, or musical score) for general distribution to the public." *Penzer v. Transp. Ins. Co.*, 29 So. 3d 1000, 1005-06 (Fla. 2010). It further clarified that to publish is "to place before the public (as through a mass medium): DISSEMINATE." *Id.* at 1006. In interpreting the Florida Supreme Court's definition, the Eleventh Circuit has held, for example, that merely providing a receipt to a customer with more than five account digits is not "publication." *Creative Hospitality Ventures, Inc. v. U.S. Liab. Ins. Co.*, 444 F. App'x 370, 375-76 (11th Cir. 2011).

In any event, it is undisputed that Millennium did not itself actively or intentionally publish the information at issue, nor is it accused of having done so. Santos Dep. 35:19-36:1. The

FOWLER WHITE BURNETT P.A. • ONE FINANCIAL PLAZA, SUITE 2100, 100 SOUTHEAST THIRD AVENUE, FORT LAUDERDALE, FL 33394• (954) 377-8100

allegation is that Millennium was negligent in allowing third-party hackers to access customers'

data. *Id.* Negligently allowing third-parties to access data is not a personal injury offense under

the Policy, which requires that the insured actively commit wrongdoing.

Although no Florida court has expressly reached this issue, the general consensus among

courts nationwide is that coverage for "personal injury" in general liability policies[9] is intended

to protect against purposeful acts committed by the insured or its agents, not by non-insureds or

third parties. *See Cnty. of Columbia v. Cont'l Ins. Co.*, 634 N.E.2d 946, 950 (N.Y. 1994)

("[C]overage under the personal injury endorsement provision in question was intended to reach

only purposeful acts undertaken by the insured or its agents."); *Harrow Prods., Inc. v. Liberty

Mut. Ins. Co.*, 64 F.3d 1015, 1025 (6th Cir. 1995) ("[E]ach enumerated tort in the personal injury

clause requires an intentional act."); *Gregory v. Tenn. Gas Pipeline Co.*, 948 F.2d 203, 209 (5th

Cir. 1991) (holding that "each of the enumerated risks specifically assumed [in Coverage B]

requires active, intentional conduct by the insured."); *Stonelight Tile, Inc. v. Cal. Ins. Guar.

Ass'n*, 58 Cal. Rptr. 3d 74, 89 (Cal. Ct. App. 2007) ("Unlike liability coverage for property

damage or bodily injury, personal injury coverage is not based on an accidental occurrence.");

*Buell Indus., Inc. v. Greater N.Y. Mut. Ins. Co.*, 791 A.2d 489, 510-11 (Conn. 2002) ("[P]ersonal

injury provisions were intended to reach only intentional acts by the insured."); *Liggett Grp., Inc.

v. Ace Prop. & Cas. Ins. Co.*, 798 A.2d 1024, 1032 (Del. 2002) (holding that Coverage B

"clearly do[es] not extend coverage to negligence claims".); *Butts v. Royal Vendors, Inc.*, 504

S.E.2d 911, 917 (W. Va. 1998) (holding that Coverage B "was not written to cover publication

by a third-party.").

---

[9] "Personal injury" and "advertising injury" are oftentimes referred to as "Coverage B", as opposed to "Coverage A", which is for bodily injury and property damage.

Fowler White Burnett P.A. • One Financial Plaza, Suite 2100, 100 Southeast Third Avenue, Fort Lauderdale, FL 33394• (954) 377-8100

Case 6:17-cv-00540-CEM-GJK   Document 72   Filed 04/30/18   Page 21 of 28 PageID 2553

In this case, the Hotel has attempted to manufacture a claim by blankly stating that "[Millennium] made private information known to third parties that violated a credit card holder's right of privacy." Exhibit "O". However, as previously stated, it is well-established under Florida law that the use of "conclusory 'buzz' words unsupported by factual allegations are not sufficient to trigger coverage." *Steinberg*, 393 F.3d at 1230 (11th Cir. 2004); *Gold Coast Marine*, 771 So. 2d at 580-81; *see also Sigma Tech Sales, Inc. v. Travelers Indem. Co.*, No. 08-60772-CIV, 2009 WL 413514, at *3 (S.D. Fla. Feb. 19, 2009). The purported "demand" contains no facts other than that "[the Hotel] became aware of a data breach in March of 2016." It does not—and cannot—provide any facts supporting a contention that the Millennium purposefully "made known" covered material, and in fact, the Hotel has expressly disclaimed such a theory. Santos Dep. 35:19-36:1.

> **3.     Every Court That Has Considered The Issue Has Found That Data Breaches Committed By Third-Party Hackers Are Not Covered By CGL Policies.**

Case law addressing the issue of coverage under general liability policies following hacking events by third-parties is admittedly scant. *See Innovak Int'l, Inc. v. Hanover Ins. Co.*, 280 F. Supp. 3d 1340, 1347 (M.D. Fla. 2017). Although various forms of data breaches have been litigated in various forums with varying results, there has been one constant. **Every** reported case where hackers obtained customer data due to the alleged negligence of the insured concluded that a CGL policy **did not** provide coverage for the loss under standard personal injury language.

FOWLER WHITE BURNETT P.A. • ONE FINANCIAL PLAZA, SUITE 2100, 100 SOUTHEAST THIRD AVENUE, FORT LAUDERDALE, FL 33394• (954) 377-8100

The first case to address this issue was the "Sony Data Breach" case, *Zurich Am. Ins. Co. v. Sony Corp. of Am.*, No. 651982/2011, 2014 WL 8382554 (N.Y. Sup. Ct. Feb. 21, 2014).[10] In the Sony Data Breach case, hackers gained access to Sony's PlayStation online services, where they obtained customers' credit card information. That decision held that there was no coverage for a data breach under the general liability policies issued by Zurich. The relevant coverage language for personal injury involved "publication, in any manner, of material that violates a person's right of privacy." The Court plainly held that this coverage provision—substantially similar to the one issued by St. Paul—only applies when the *policyholder* makes the publication. It does *not* apply in the case of a hack by a third party. Indeed, it stated that the publication of private information in such a circumstance was perpetrated by the hackers, themselves, not the insured. It further found that the definition of personal injury offense "requires the policyholder to perpetrate or commit the act," and reasoned that construing the policy to include the acts of third parties "would be expanding coverage beyond what the insurance carriers were…knowingly entering into." As noted *supra*, the rule articulated in the Sony case has generally been the rule nationwide with respect to personal injury liability. Because Millennium did not make, and is not alleged to have made, a purposeful publication, there is no coverage.

The decision in the Sony Data Breach case was subsequently relied upon by a court in Florida. The facts in *Innovak Int'l, Inc. v. Hanover Ins. Co.*, 280 F. Supp. 3d 1340 (M.D. Fla. 2017) were substantially similar to those in *Sony*.[11] Innovak was sued in a class action lawsuit in

---

[10] It should be noted that the Zurich policy in the Sony Data Breach case is substantially identical to the Zurich policy obtained by the Hotel. *See* Exhibit "I".

[11] It is important to note at the outset that although *Innovak* was decided by a Florida court, that court applied South Carolina insurance law pursuant to the doctrine of *lex loci contractus*. However, the South Carolina insurance principles recited by the *Innovak* court are substantially identical to Florida's principles of insurance contract interpretation, as set forth in Section III.B of this Motion. As a result, the fact that the *Innovak* court

FOWLER WHITE BURNETT P.A. • ONE FINANCIAL PLAZA, SUITE 2100, 100 SOUTHEAST THIRD AVENUE, FORT LAUDERDALE, FL 33394• (954) 377-8100

Alabama arising out of a data breach of Innovak's systems. Innovak sought coverage from Hanover, its general liability insurer, for defense and indemnity in that lawsuit. The Hanover policy defined "personal injury" in relevant part as injury arising out of "Oral or written publication, in any manner, of material that violates a person's right of privacy." The *Innovak* court explicitly cited to and discussed the Sony Data Breach case and its reasoning. Its conclusion: "The Court concurs in that reasoning and finds that the only plausible interpretation of Coverage B is that it requires the insured to be the publisher of the [personal private information]." *Id.* at 1348.

### 4.  To The Extent There Is A Claim, There Is No Property Damage.

The Defendants have previously suggested that because the Hotels' customers may have needed to have their credit cards replaced, "property damage" under Coverage A may have occurred.[12]

On summary judgment, it is now clear that this claim has no merit. Under the Policy's terms, the electronic data stored on the customers' credit cards is not "tangible property," and the customers' loss of use of such data would not, therefore, be covered "property damage." Even if "property damage" did occur, that property damage was not suffered by the hotel, which is the putative claimant in this case. If anyone suffered "property damage" within the meaning of the policy (and St. Paul does not concede that any such damage occurred), it would have been the customers, not the Hotel. And despite the breach having occurred over two years ago, no

---

applied South Carolina law is of no moment. *See James River Ins. Co. v. Arlington Pebble Creek, LLC*, 188 F. Supp. 3d 1246, 1254 (N.D. Fla. 2016) (noting that when two states' laws do not significantly differ in their treatment of insurance contracts, and application of either state's law would lead to the same outcome, a "false conflict" exists). St. Paul submits that based on the law cited in the court's opinion, *Innovak* would have been decided identically under either Florida or South Carolina law.

[12] The Policies define "property damage" in relevant part as "loss of use of tangible property of others that isn't physically damaged."

customers have made any claims against the Hotel as a result of the breach. Santos Dep. 47:9-11. Nor have the Hotel or Millennium provided any evidence that any allocation of the fines and penalties levied by the card issuers have been set aside for "property damage."[13]

Perhaps more importantly, the "demand letter" does not allege property damage at all, much less property damage stemming from the replacement of credit carsd. Again, the "demand letter" only recites (nearly verbatim) the personal injury offense of "Making known to any person or organization covered material that violates a person's right of privacy." There is no mention in the letter of any damage to tangible property, whether by the recitation of facts or the invocation of "buzz words" pulled from the policy language. Further, the Hotel has admitted, through both the testimony of its corporate representative and its interrogatory responses, that it is not seeking compensation for its customers' temporary inconvenience. Santos Dep. 47:17-48:8; *see also* Exhibit "A". Put simply, there has been no damage to tangible property, the Hotel's isn't claiming such damage, the Hotel's witnesses have denied that they are claiming such damage, and the hotel isn't even the party with standing to claim such damage.

### 5.    The Cost of Compliance With Notification Statutes Is Not Covered.

The damages apparently claimed by the Hotel against Millennium form some combination of fees and penalties applied by the credit card companies and the general costs of complying with various data breach notification laws. Such damages are not covered by a

---

[13] To be clear, St. Paul's position is that a credit card is just a physical manifestation of intangible property, and therefore is not properly considered physical property. *See Camp's Grocery, Inc. v. State Farm Fire & Cas. Co.*, No. 4:16-cv-0204-JEO, 2016 WL 6217161, at *8 (N.D. Ala. Oct. 25, 2016) (claims for damages arising out of allegedly unlawful handling of electronic data on credit cards are not claims for "property damage" under the policy); *R&L Zook, Inc. v. Pac. Indem. Co.*, No. 07-03774, 2008 WL 1931006, at *4 (E.D. Pa. May 1, 2008) ("A check is not 'tangible property' because it does not have intrinsic value. Similar to stock certificates, promissory notes, and credit cards, checks merely represent value.").

general liability policy. *Recall Total Info. Mgmt., Inc. v. Fed. Ins. Co.*, 83 A.3d 664 (Conn. App. Ct. 2014), *aff'd*, 115 A.3d 458 (Conn. 2015).

*Recall* did not involve a hack. Instead, the insured, a records storage company, contracted with IBM to transport and store certain employee records on data tapes. Recall then entered into a subcontract with a company called Ex Log to actually transport the tapes. In transport, the tapes fell off the back of a truck, were taken from the roadside by an unknown person, and were otherwise never recovered. IBM claimed approximately $6 million in expenses related to fraud protection and credit monitoring, and negotiated a settlement with Recall for the full amount of the loss. Recall sought indemnification from Ex Log, and Ex Log made a claim on its general liability policy. The insurer denied coverage, Ex Log and Recall settled, and Recall pursued claims against the insurer.

The Court concluded, *inter alia*, as follows:

> In this case, IBM claims to have suffered a loss of more than $6 million related to the alleged compliance with these notification statutes. While we do not speculate as to whether these expenditures were required by law, we conclude that they do not constitute a personal injury as defined in the policy. These notification statutes simply do not address or otherwise provide for compensation from identity theft or the increased risk thereof, they merely require notification to an affected person that he may protect himself from potential harm. Accordingly, merely triggering a notification statute is not a substitute for personal injury.

*Recall*, 83 A.3d at 464. The Hotel is claiming approximately $64,000 between attorney's fees and notification costs in connection with the breach. That amount is clearly not covered.

## IV.   **CONCLUSION**

This is a case where a non-insured entity, the Hotel, was hacked by third parties. The hackers gained access to the Hotel's customers' credit card information. Millennium did not

- 25 -

publish or "make known" that information. Millennium's role was to set up a security system that appears to have ultimately been ineffective. The Hotel and Millennium had cyber coverage with Beazley that would have applied but for the application of the retroactive date. It was only after multiple other carriers denied coverage that Millennium decided to "roll the dice" by submitting a claim to St. Paul for damages it knew to be uncovered (the same claim having been denied by the Hotel's general liability insurer, Zurich). In the end, the Hotel seeks to pay its left pocket out of its right pocket; despite admitting that it makes no difference who bears the loss between Millennium and the Hotel, the Hotel (in conjunction with ProvInsure) sent a bare-bones, pretextual "demand" to its wholly-owned subsidiary with conclusory allegations intended **solely** to trigger liability coverage.

The Hotel—the only claimant against Millennium—has not and cannot create a claim against Millennium that would trigger coverage under a general liability policy. As discussed above, the personal injury coverage provided by general liability policies simply does not apply to cases where data breaches occurred on account of a hack. Personal injury coverage requires that the insured take some affirmative action. Millennium is not alleged to have done any such thing, and the Hotel's attempt to trigger coverage by the use of conclusory buzz words cannot create coverage. Nor has the Hotel alleged to have suffered property damage. To the extent the temporary loss of use of credit cards constitutes "property damage"—which is disputed—such property damage can only be claimed by the Hotel's customers, not the Hotel itself. The Hotel has not and cannot state a claim for its own damaged property because none exists.

WHEREFORE, St. Paul Fire & Marine Insurance Company respectfully requests that the Court grant summary judgment in its favor as well as any further relief that the Court deems just and appropriate under the circumstances.

FOWLER WHITE BURNETT P.A. • ONE FINANCIAL PLAZA, SUITE 2100, 100 SOUTHEAST THIRD AVENUE, FORT LAUDERDALE, FL 33394• (954) 377-8100

## CERTIFICATE OF SERVICE

I hereby certify that on April 30th, 2018, the foregoing document was electronically filed with the Clerk of the Court using CM/ECF.  I also certify that the foregoing document is being served this day on all counsel of record on the attached Service List in the manner specified, either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

s/ Rory Eric Jurman
Rory Eric Jurman


Respectfully submitted,


/s/ Rory Eric Jurman
Rory Eric Jurman
Fla. Bar No. 194646
Email: rjurman@fowler-white.com

Aaron M. Dmiszewicki
Fla. Bar No. 111455
Email: admiszewicki@fowler-white.com

FOWLER WHITE BURNETT, P.A.
One Financial Plaza, Suite 2100
100 Southeast Third Avenue
Fort Lauderdale, Florida 33394
Telephone:   (954) 377-8100
Facsimile:   (954) 377-8101

## SERVICE LIST

### CASE NO. 6:17-CV-540-ORL-41-GJK

Scott N. Godes, Esq.
Barnes & Thornburg LLP
1717 Pennsylvania Avenue N.W.
Suite 500
Washington, D.C. 20006-4623
E-Mail: scott.godes@btlaw.com;
Carrie.Raver@btlaw.com
Telephone: (202) 408-6928
Facsimile: (202) 289-1330
Attorney for Rosen Millennium Inc.

Darryl R. Richards, Esq.
Johnson, Pope, Bokor, Ruppel & Burns, LLP
Sun Trust Financial Centre
401 E. Jackson Street, Suite 3100
Tampa, FL 33602
E-Mail: darrylr@jpfirm.com;
gwenb@jpfirm.com
Telephone: (813) 225-2500
Facsimile: (813) 223-7118
Attorney for Rosen Millennium Inc.

FOWLER WHITE BURNETT P.A. • ONE FINANCIAL PLAZA, SUITE 2100, 100 SOUTHEAST THIRD AVENUE, FORT LAUDERDALE, FL 33394• (954) 377-8100